Patrick R. Leverty
LEVERTY & ASSOCIATES LAW CHTD.
832 Willow Street
Reno, NV 89502
Tel. 775.322.6636
Fax. 775.322.3953
Email: pat@levertylaw.com

*Attorneys for Plaintiff*

[Additional counsel on signature block]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KURT DOBLER, derivatively on behalf of CELSIUS HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN FIELDLY, JARROD LANGHANS, NICHOLAS CASTALDO, DAMON DESANTIS, HAL KRAVITZ, JIM LEE, CAROLINE LEVY, CHERYL MILLER, and JOYCE RUSSELL, <br><br> Defendants, <br><br> and <br><br> CELSIUS HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.:  3:24-cv-578 |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Kurt Dobler ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Celsius Holdings, Inc. ("Celsius" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants John Fieldly ("Fieldly"), Jarrod

Langhans ("Langhans"), Nicholas Castaldo ("Castaldo"), Damon Desantis ("Desantis"), Hal Kravitz ("Kravtiz"), Jim Lee ("Lee"), Caroline Levy ("Levy"), Cheryl Miller ("Miller"), and Joyce Russell ("Russell") (collectively, the "Individual Defendants" and together with Celsius, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Celsius, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Fieldly and Langhans for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celsius, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Celsius' directors and officers from February 29, 2024 to September 4, 2024, both dates inclusive (the "Relevant Period").

2.      Celsius is a Nevada incorporated company based in Boca Raton, Florida that operates in the functional energy drink category in the U.S. and internationally by engaging in the "development, processing, marketing, sale, and distribution of functional energy drinks to a broad range of consumers" and by providing "differentiated products that offer clinically proven and innovative formulas meant to positively impact the lives of our consumers."

3.    The Company's primary product is CELSIUS®, which is marketed as a fitness drink or supplement which, with exercise, is designed to accelerate metabolism and burn body fat while providing energy. The CELSIUS product line comes in two versions, a ready-to-drink form and an on-the-go powder form.

4.    In 2023, the Company introduced a new CELSIUS® Essentials line, available in 16-ounce cans. The Company's products are currently offered in major retail channels across the U.S., including via conventional grocery, natural, convenience, fitness, mass market, vitamin specialty and e-commerce, and internationally in certain Canadian, European, Middle Eastern and Asia-Pacific markets.

5.    Since expanding into the energy drink market, the Company has enjoyed significant growth in sales and revenue. For instance, the Company's 2023 sales exceeded $1.3 billion while in 2020 sales totaled $130.7 million.

6.    The Company's long-term strategic partnership with PepsiCo, Inc. ("Pepsi") has been an integral part of the Company's rapid growth. On August 1, 2022, Celsius entered into a long-term distribution agreement and a separate transition agreement with Pepsi (collectively, the "Distribution Agreement") by which Pepsi would utilize its large network of retail and food service channels to be Celsius' primary product distributor in the U.S. and the exclusive Celsius product distributor in Canada.

7.    The Distribution Agreement also provided Pepsi the option to become Celsius' preferred distribution partner in other international markets. In executing the Distribution Agreement, Celsius terminated various supply agreements with existing suppliers to transition certain territory rights to Pepsi. The Distribution Agreement also called for Pepsi to make a sizable investment in Celsius by purchasing 1.5 million shares of convertible preferred stock, called Series A Preferred Stock, for about $550 million, with the preferred shares entitled to a 5% annual dividend. Shares underlying the transaction were priced at $75 per share, or approximately 7.33 million shares, which provided Pepsi with an estimated 8.5% ownership in Celsius on an as-converted basis. The deal also permitted Pepsi to nominate a director to

Celsius' Board of Directors (the "Board"). Pepsi chose Pepsi deputy Chief Financial Officer ("CFO") Defendant Lee.

8.      In the two years preceding the signing of the Pepsi deal in August 2022, the Company was already growing at a remarkable pace, with average sales growth exceeding 100%. For example, revenues rose from $130.7 million in 2020 to $314.3 million in 2021 to $653.6 million in 2022.

9.      Yet, the Individual Defendants heralded the Pepsi deal in Celsius' public filings. For instance, on February 29, 2024, Celsius filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023 ("2023 10-K"). The 2023 10-K represented that "this strategic alignment with Pepsi will not only continue to strengthen our distribution capabilities but also open up new opportunities for product development and market expansion." The 2023 10-K also stated that Celsius' reliance on Pepsi's distribution capabilities formed a "cornerstone" of Celsius' strategy to "enhance accessibility and presence in diverse retail environments, further solidifying our position in the competitive energy drink market."

10.      At first, this appeared to be true. After inking the partnership with Pepsi, the Company's revenues skyrocketed from $653.6 million in 2022 to $1.318 billion in 2023, marking a staggering 102% rise in revenues. Celsius attributed this impressive growth to increased revenues from North America due to "continued gains in distribution points and SKUs per location," where, in 2023 alone, revenues topped $1.2 billion, marking an increase of $645.9 million, or 105%, from the year prior. Gross margins increased as well. Celsius reported gross margins of 48% in 2023.

11.      In the fourth quarter of 2023, the Company and Pepsi agreed to expand Celsius' Canadian presence by starting to ship products to Pepsi Canada. During 2023, Celsius' sales to Pepsi made up 59.4% of Celsius' total net revenue (up from 22.2% during 2022), and receivables from Pepsi made up 69.0% of Celsius' total receivables (up from 47.6% in 2022).

12.    Indeed, by dint of the Distribution Agreement, Celsius significantly cut its web of distributors and ended up "dependent on Pepsi's domestic distribution platforms."

13.    However, the Individual Defendants concealed that when Pepsi became Celsius' primary distributor, Pepsi made a large one-time purchase of Celsius product inventory during the first year of the partnership, which drove up the Company's 2023 revenues by more than 100% to $1.318 billion.

14.    This impressive growth made Celsius stock a shiny target, as the Individual Defendants made it outwardly appear as if demand for Celsius' products was booming while simultaneously concealing that Pepsi's warehouses were already overfilled with Celsius products from the massive one-time purchase.

15.    Making matters worse, Celsius had already recognized revenues for the products shipped to Pepsi, which would later have be drawn down and would adversely affect the Company's financial performance and outlook in the future.

16.    The truth began to emerge on May 27, 2024, when Nielsen reported certain latest trends in retail store performance. Market analysts quickly responded by writing that the Company faced difficult sales comparisons for the next few quarters and that product sales could be significantly less as Pepsi cut the amount of product inventory it held, resulting in "2Q24 sales below end-demand."

17.    On this news, the Company's stock price fell $12.23 per share, or almost 13%, from closing at $95.15 per share on May 24, 2024, to close at $82.92 per share on May 28, 2024, the next trading day.

18.    However, the Individual Defendants continued to make false and misleading statements. On August 6, 2024, the Company reported its second quarter of 2024 financial results, which stated that revenue rose 23% year-over-year to $402 million, international sales enjoyed a 30% jump to $19.6 million, and sales to Amazon rose 41% to about $39.9 million. During the accompanying earnings conference call held that same day to discuss the Company's second quarter of 2024 financial results, Defendant Fieldly stated that the Company "still grew at 10x the category growth rate in the second quarter," that Celsius

was "moving aggressively to gain our growth and momentum," and that the Company has "great programs for the back half of the third quarter and into the fourth quarter."

19.    Then, on September 4, 2024 during market hours, Defendant Fieldly and Celsius Chief of Staff Toby David ("David") attended the Barclays 17th Annual Global Consumer Staples Conference. During the conference, Fieldly discussed Celsius' Distribution Agreement with Pepsi, and revealed that Celsius' sales to Pepsi were cut from "roughly around [$]100 million to [$]120 million . . . from what [Pepsi] ordered last quarter." More specifically, David revealed that "[J]ust to be precise with the [$]100 million to [$]120 million figure, . . . *we're seeing approximately [$]100 million to [$]120 million less in orders to Pepsi in Q3 this year versus Q3 last year*."[1] He further revealed that "What we are seeing correlate is depletions out of the Pepsi warehouse" which "simply means that *they were holding to several million more cases over the past 1.5 years than they really needed to hold*, and they're optimizing their network now."

20.    On this news, the Company's stock price fell $4.11 per share, or about 11.6%, from closing at $36.50 per share on September 3, 2024, to close at $32.39 per share on September 4, 2024.

21.    The truth fully emerged on November 6, 2024, when, before the market opened, the Company reported, via press release, its third quarter of 2024 financial results, revealing the true impact Pepsi's product inventory hoarding had on Celsius' overall business. Defendant Fieldly revealed in the press release that the "'[p]ronounced supply chain optimization by'" Pepsi that he personally had touted "'had an outsized and adverse impact on [Celsius'] operating results.'" Similarly, Defendant Langhans revealed that the Company's "'[g]ross and operating margins in the third quarter fell short due to significantly reduced orders because [its] largest distributor implemented a sizable . . . supply chain optimization program in the quarter.'"

---

[1] All emphasis herein is added unless otherwise noted.

22.     On this news, the Company's stock price fell $1.69 per share, or about 5%, from closing at $31.73 per share on November 5, 2024, to close at $30.04 per share on November 6, 2024.

23.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

24.     Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Celsius, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

25.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

26.     Moreover, seven of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping staggering personal profits ***exceeding $491 million***.

27.     In light of the Individual Defendants' misconduct, which has subjected Celsius and its President, Chairman of the Board, Chief Executive Officer ("CEO"), and CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

28.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, all of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

34.     Plaintiff is a current shareholder of Celsius. Plaintiff has continuously owned shares of Celsius common stock since before the beginning of the Relevant Period.

### Nominal Defendant Celsius

35.     Celsius is a Nevada corporation with its principal executive offices at 2424 N. Federal Hwy, Suite 208, Boca Raton, FL, 33431. Celsius' shares trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "CELH."

### Defendant Fieldly

36.     Defendant Fieldly has served as Chairman of the Board since August 2021, as CEO since April 2018 and as a member of the Board since March 2017. According to the Company's Schedule 14A filed with the SEC on April 12, 2024 (the "2024 Proxy Statement"), as of April 1, 2024, Defendant Fieldly beneficially owned 3,509,831 shares of the Company's common stock, which represented 1.5% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant Fieldly owned approximately $289.6 million worth of Celsius stock as of that date.

37.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Fieldly received $3,260,513 in compensation from the Company.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fieldly made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 3/4/24 | 119,604 | $85.07 | $10,174,712 |

Thus, in total, before the fraud was exposed, he sold 119,604 shares of Company common stock on inside information, for which he received approximately $10.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

39.     The 2024 Proxy Statement stated the following about Defendant Fieldly:

John Fieldly has served as Chairman of the Board of Directors since August 2021, as Chief Executive Officer since April 2018 and as a member of the Board since March 2017. Mr. Fieldly joined the Company in January 2012 as its Chief Financial Officer and from March 2017 to March 2018 served as both Interim Chief Executive Officer and Chief Financial Officer. Prior to joining the Company, Mr. Fieldly held leadership roles at Oragenics, Inc., Lebhar-Friedman and Eckerd Drugs, Inc. Mr. Fieldly received a degree in accounting from the University of South Florida, and is a Certified Public Accountant in Florida. Mr. Fieldly's qualifications to serve on the Board and as Chief Executive Officer include his deep knowledge of the Company and the energy drink industry, as well as significant experience in accounting, finance and executive leadership.

**Defendant Langhans**

40.     Defendant Langhans has served as the Company's CFO since April 2022. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Langhans beneficially owned 39,858 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant Langhans owned approximately $3.3 million worth of Celsius stock as of that date.

41.     For the 2023 Fiscal Year, Defendant Langhans received $1,685,144 in compensation from the Company.

42.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Langhans made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 3/4/24 | 5,500 | $85.61 | $470,855 |
| 4/19/24 | 4,079 | $69.42 | 283,164 |

Thus, in total, before the fraud was exposed, he sold 9,579 shares of Company common stock on inside information, for which he received approximately $754,019 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

43.    The 2024 Proxy Statement stated the following about Defendant Langhans:

Mr. Langhans has served as Chief Financial Officer since April 2022. From June 2020 to April 2022, Mr. Langhans served as Chief Financial Officer of the European and Israel operating segments of Primo Water Corporation. From July 2012 through May 2020, Mr. Langhans held various executive positions within Primo Water Corporation across the accounting, finance and investor relations areas. Mr. Langhans' prior experience also includes working for major accounting firms such as CBIZ Mayer Hoffman McCann (MHM) and Cherry Bekaert. He is a Certified Public Accountant in Florida and has an extensive and diversified financial and leadership background across areas such as financial reporting, including SEC, GAAP and IFRS, financial planning and analysis, mergers and acquisitions, investor relations, and debt and equity issuances, as well as strategic and business analysis and transformation. Mr. Langhans has a master's degree in accounting from the University of Florida.

**Defendant Castaldo**

44.    Defendant Castaldo has served as a Company director since March 2013. He also serves as a member of the Human Resources & Compensation Committee and as a member of the Governance & Nominating Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Castaldo beneficially owned 351,288 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant Castaldo owned approximately $28.9 million worth of Celsius stock as of that date.

45.    For the 2023 Fiscal Year, Defendant Castaldo received $184,964 in compensation from the Company.

46.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Castaldo made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/4/24 | 165,000 | $83.33 | $13,749,450 |

Thus, in total, before the fraud was exposed, he sold 165,000 shares of Company common stock on inside information, for which he received approximately $13.7 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

47.    The 2024 Proxy Statement stated the following about Defendant Castaldo:

Nicholas Castaldo has served as a director since March 2013. Mr. Castaldo's career spans over 35 years in consumer businesses in the food and beverage industry with executive positions in public and private companies, multi-nationals and start-ups. He is a member of the Advisory Board of Frank Pepe Pizzeria, a regional casual dining restaurant concept. He is an Equity Partner of Lime Fresh Mexican Grill, a fast-casual Mexican restaurant chain where he served as the company's Chief Marketing Officer for two years. Mr. Castaldo was an Equity Partner and member of the founding management team of Anthony's Coal Fired Pizza, a casual dining restaurant chain, where he served as President, as Senior Vice-President and Chief Marketing Officer, and as a board member for 12 years. He also served for eight years as President of Pollo Tropical, a Miami-based fast casual restaurant chain. He has also held senior marketing positions at Denny's, CitiCorp Savings and Burger King. Mr. Castaldo is a member of the Marketing Advisory Board and an adjunct professor at the H. Wayne Huizenga College of Business and Entrepreneurship at Nova Southeastern University. He earned his MBA from the Harvard Business School at Harvard University. Mr. Castaldo's qualifications to serve on the Board include his significant experience in the food and beverage industry, as well as his executive leadership and management experience.

**Defendant DeSantis**

48.    Defendant DeSantis has served as a Company director since March 2013. He also serves as the Chair of the Governance & Nominating Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant DeSantis beneficially owned 717,147 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant DeSantis owned approximately $59.1 million worth of Celsius stock as of that date.

49.    For the 2023 Fiscal Year, Defendant DeSantis received $189,964 in compensation from the Company.

50.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant DeSantis made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/4/24 | 4,000,000 | $67.46 | $269,840,000 |
| 3/13/24 | 100,000 | $95.75 | $9,575,400 |
| 4/29/24 | 428,568 | $59.67 | $25,571,366 |
| 4/30/24 | 428,568 | $59.67 | $25,571,366 |
| 5/1/24 | 428,568 | $59.67 | $25,571,366 |
| 5/2/24 | 428,574 | $59.67 | $25,571,724 |
| 5/3/24 | 428,574 | $59.67 | $25,571,724 |
| 5/6/24 | 428,574 | $59.67 | $25,571,724 |
| 5/7/24 | 428,574 | $59.67 | $25,571,724 |
| 5/16/24 | 53,880 | $92.81 | $5,000,603 |

Thus, in total, before the fraud was exposed, he sold 7,153,880 shares of Company common stock on inside information, for which he received approximately $463.4 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

51.    The 2024 Proxy Statement stated the following about Defendant DeSantis:

Damon DeSantis has served as a director since August 2021. Since June 2022, Mr. DeSantis has also served as a member of the board of directors of Integrated BioPharma Inc. (OTC: INBP), an established manufacturing and sales company engaging primarily in the manufacturing, distributing, marketing and sales of vitamins, nutritional supplements, and herbal products. Since January 2019, he has also served as a member of the board of advisors of MacPherson's, the largest employee-owned distributor of creative materials and art supplies in North America. Mr. DeSantis' corporate business interests continue with ownership, direct investment, and board membership in a variety of private businesses in the hospitality, financial services, automotive, spirits and cannabis industries. Previously, until 2001, Mr. DeSantis served as Chief Executive Officer and as a member of the board of directors of Rexall Sundown Nutritional Company, a former Nasdaq 100 company. Rexall Sundown was in the business of developing, manufacturing, packaging, marketing, and distributing nutritional products with over 2800 SKUs to wholesalers, distributors, and retailers in the United States and worldwide. He is the son of Carl DeSantis, who was formerly one of the principal stockholders of Celsius. Mr. DeSantis' qualifications to serve on the Board include his wide array of business experience.

1

**Defendant Kravtiz**

2

52.     Defendant Kravtiz has served as the Lead Independent Director and as a Company director

3

since April 2016. He also serves as a member of the Human Resources & Compensation Committee.

4

According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Kravtiz beneficially owned

5

216,206 shares of the Company's common stock. Given that the price per share of the Company's

6

7

common stock at the close of trading on April 1, 2024 was $82.53, Defendant Kravtiz owned

8

approximately $17.8 million worth of Celsius stock as of that date.

9

53.     For the 2023 Fiscal Year, Defendant Kravitz received $204,264 in compensation from the

10

Company.

11

54.     During the Relevant Period, while the Company's stock price was artificially inflated and

12

before the scheme was exposed, Defendant Kravitz made the following sale of Company common stock:

13

14

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 5/14/24 | 16,500 | $90.27 | $1,489,455 |

15

Thus, in total, before the fraud was exposed, he sold 16,500 shares of Company common stock on inside

16

information, for which he received approximately $1.5 million in proceeds. His insider sales, made with

17

knowledge of material nonpublic information before the material misstatements and omissions were

18

exposed, demonstrates his motive in facilitating and participating in the scheme.

19

55.     The 2024 Proxy Statement stated the following about Defendant Kravitz:

20

21

**Hal Kravitz** has served as a director since April 2016 and as the Lead Independent Director since July 2021. Since October 2023, Mr. Kravitz has served as an external advisor for the consumer products and retail practices at Bain & Company, a management consulting company. From November 2018 through November 2021, Mr. Kravitz served as President, Certified Management Group, a division of Advantage Solutions. From 2014 to 2018, Mr. Kravitz served as Chief Executive Officer of AQUAhydrate, Inc., a company engaged in the manufacture, distribution, and marketing of premium bottled water. In 2013, Mr. Kravitz helped form InterContinental Beverage Capital as a founding member, a New York-based merchant bank focused on investments in the beverage and other consumer packaged goods industries. For 30 years prior thereto, Mr. Kravitz served in positions of increasing responsibility within the Coca-Cola system, including as an executive officer and in other management positions, and as President of Glaceau Company, makers of Vitaminwater® and Smartwater®. Mr. Kravitz received a degree in

22

23

24

25

26

27

28

accounting from the University of Georgia. Mr. Kravitz's qualifications to serve on the Board include his extensive experience in the beverage industry.

**Defendant Lee**

56.    Defendant Lee served as a Company director from August 2022 until September 19, 2024. He also served as a member of the Audit and Enterprise Risk Committee and as a member of the Governance and Nominating Committee.

57.    The 2024 Proxy Statement stated the following about Defendant Lee:

Jim Lee has served as a director since August 2022. Mr. Lee has served in roles of increasing responsibility with PepsiCo, Inc. (NASDAQ: PEP) ("PepsiCo") for over 25 years and currently serves as Deputy Chief Financial Officer and Senior Vice President. In this role, he leads PepsiCo's tax, treasury, investor relations and ESG reporting functions as well as having functional ownership for the finance teams in the international sectors. Prior to that, Mr. Lee was Senior Vice President, Corporate Finance for PepsiCo where he led tax, treasury and the global SAP program. In addition, he was Senior Vice President, Chief Strategy and Transformation Officer for PepsiCo Beverages North America ("PBNA"), where he was responsible for leading PBNA's long-term strategy, business development, digital and value chain transformation, and sustainability. Mr. Lee joined PepsiCo in 1998 and has held several finance leadership roles since that time, including Senior Vice President Finance for PBNA, Senior Vice President and Chief Financial Officer of the Russia and CIS Region, Vice President and Chief Financial Officer of Southeast Europe, Senior Director and Chief Financial Officer of PepsiCo Australia and New Zealand, and Senior Director, Strategy and Planning of China Beverages. Mr. Lee holds a BSE in Operations Research from Princeton University and an MBA from Columbia University. Mr. Lee also serves on the board of directors for Tropicana Brands Group, and on the board of trustees for Caramoor Center for Music and Arts. Mr. Lee's qualifications to serve on the Board include his extensive experience in the beverage industry.

Mr. Lee was elected to serve on the Board pursuant to an agreement between the Company and PepsiCo whereby PepsiCo currently has the right to designate one nominee to the Board.

**Defendant Levy**

58.    Defendant Levy has served as a Company director since July 2020. She also serves as a member of the Audit and Enterprise Risk Committee and as a member of the Governance and Nominating Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Levy beneficially owned 106,315 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on April 1, 2024 was $82.53, Defendant Levy owned approximately

$8.7 million worth of Celsius stock as of that date.

59.    For the 2023 Fiscal Year, Defendant Levy received $184,964 in compensation from the

Company.

60.    During the Relevant Period, while the Company's stock price was artificially inflated and

before the scheme was exposed, Defendant Levy made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 3/13/24 | 20,000 | $94.77 | $1,895,400 |

Thus, in total, before the fraud was exposed, she sold 20,000 shares of Company common stock on inside

information, for which she received approximately $1.9 million in proceeds. Her insider sales, made with

knowledge of material nonpublic information before the material misstatements and omissions were

exposed, demonstrates her motive in facilitating and participating in the scheme.

61.    The 2024 Proxy Statement stated the following about Defendant Levy:

Caroline Levy has served as a director since July 2020. Since November 2019, Ms. Levy
has served as the founder of Caroline Levy Advisory Services, which provides strategic
and financial advice to investors and corporations in the beverage, household products and
cosmetics industries. From June 2017 to November 2019, Ms. Levy served as Senior
Equity Research Analyst at Macquarie Group Limited, covering both large and small cap
beverage companies. Prior to that, Ms. Levy spent eight years as a managing director and
senior analyst at CLSA. This followed a decade at UBS, where Ms. Levy headed the U.S.
consumer research team, while also holding the position of Chief Operating Officer for
U.S. Equity Research and Chair of the Investment Review Committee. Ms. Levy also
serves on the board of directors of Health-Ade Kombucha, a maker of kombucha products,
where she also serves on the Strategy Committee, and Athletic Brewing Company, a non-
alcoholic craft beer company. She is also an advisor to Nirvana Water Sciences, a producer
of bottled water and other products. Ms. Levy holds degrees in economics and accounting
from the University of Cape Town. Ms. Levy has made numerous media appearances
including CNBC's "Mad Money with Jim Cramer" and Bloomberg. Additionally, she has
been recognized multiple times, including "The Institutional Investor All Star survey" and
"The Wall Street Journal analyst rankings", for stock picking and earnings accuracy.
Ms. Levy's qualifications to serve on the Board include her experience in equity analysis
and capital markets in the beverage company sector.

**Defendant Miller**

62.    Defendant Miller has served as a Company director since August 2021. She also serves as the Chair of the Audit and Enterprise Risk Committee and as a member of the Governance and Nominating Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Miller beneficially owned 15,165 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant Miller owned approximately $1.3 million worth of Celsius stock as of that date.

63.    For the 2023 Fiscal Year, Defendant Miller received $194,964 in compensation from the Company.

64.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Miller made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 3/4/24 | 3,000 | $83.17 | $250,980 |

Thus, in total, before the fraud was exposed, she sold 3,000 shares of Company common stock on inside information, for which she received approximately $250,980 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

65.    The 2024 Proxy Statement stated the following about Defendant Miller:

Cheryl Miller has served as a director since August 2021. From January 2022 to October 2022, Ms. Miller served as Chief Financial Officer of West Marine, the nation's leading omni-channel provider of products, services and expertise for the marine aftermarket. Prior to that, from April 2021 to December 2021, Ms. Miller served as an executive strategic advisor for JM Family Enterprises, a diversified automotive company, where she also served as Executive Vice President and Chief Financial Officer from January 2021 to April 2021. Ms. Miller has also previously served as President and Chief Executive Officer and held positions of Executive Vice President and Chief Financial Officer, Treasurer and Vice President of Investor Relations between 2010 and April 2020 with AutoNation Inc. (NYSE: AN), a publicly traded Fortune 150 automotive retailer. She also served on AutoNation Inc.'s board of directors from July 2019 to July 2020. In addition, since 2016, Ms. Miller has served on the board of directors of Tyson Foods, Inc. (NYSE: TSN), one of the world's largest public food companies where she is a member of the audit committee and chairs the compensation & leadership development committee. Ms. Miller holds a bachelor's

degree in finance and business administration from James Madison University. Ms. Miller's qualifications to serve on the Board include her corporate finance experience in consumer-focused industries, including her experience as a corporate chief financial officer.

**Defendant Russell**

66.     Defendant Russell has served as a Company director since October 2021. She also serves as a member of the Audit and Enterprise Risk Committee and as the Chair of the Human Resource and Compensation Committee. According to the 2024 Proxy Statement, as of April 1, 2024, Defendant Russell beneficially owned 16,665 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2024 was $82.53, Defendant Russell owned approximately $1.4 million worth of Celsius stock as of that date.

67.     For the 2023 Fiscal Year, Defendant Russell received $192,464 in compensation from the Company.

68.     The 2024 Proxy Statement stated the following about Defendant Russell:

Joyce Russell has served as a director since October 2021. Since its formation in 2019, Ms. Russell has served as President of the Adecco Group U.S. Foundation, which is focused on up/re-skilling American workers and helping to ensure work equality for all. Ms. Russell previously served as President of Adecco Staffing U.S. from 2004 to 2018, an affiliate of the Swiss public company Adecco Group AG, a Fortune Global 500 company, and she brings over 36 years of experience specializing in human resource solutions. Ms. Russell is a member of Women Corporate Directors and the Committee of 200. She is also on the board of directors of the American Staffing Association and Dress for Success Worldwide. Ms. Russell has been a panelist at the World Economic Forum in Davos and a panelist at Fortune's Most Powerful Women Summit. Ms. Russell holds a Bachelor of Arts degree in business and communications from Baylor University. Ms. Russell's qualifications to serve on the Board include her extensive experience in human resources.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors, and/or fiduciaries of Celsius and because of their ability to control the business and corporate affairs of Celsius, the Individual Defendants owed Celsius and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Celsius in a fair, just, honest, and equitable

manner. The Individual Defendants were and are required to act in furtherance of the best interests of Celsius and its shareholders so as to benefit all shareholders equally.

70.    Each director and officer of the Company owes to Celsius and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Celsius, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.    To discharge their duties, the officers and directors of Celsius were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.    Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Celsius, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Celsius' Board at all relevant times.

74.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.     To discharge their duties, the officers and directors of Celsius were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Celsius were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Florida, and the United States, and pursuant to Celsius' own Code of Ethical Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Celsius conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Celsius and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Celsius' operations would comply with all applicable laws and Celsius' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.    Each of the Individual Defendants further owed to Celsius and the shareholders the duty of loyalty requiring that each favor Celsius' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

77.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Celsius and were at all times acting within the course and scope of such agency.

78.    Because of their advisory, executive, managerial, and directorial positions with Celsius, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Celsius.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

80.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement abuse of control, and violations of Sections 14(a), 10(b), and 21D Exchange Act.

82.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Celsius was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

83.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Celsius and was at all times acting within the course and scope of such agency.

### CELSIUS'S CODE OF ETHICAL CONDUCT

85.    Celsius' Code of Ethical Conduct (the "Code of Ethics") begins by stating that "we are committed to conducting our business with integrity. This Code of Ethical Conduct is a guide for every Company employee in applying legal and ethical practices to their everyday work. The Code describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect us." The Code of Ethics further states that "There is no quality more important than integrity. This applies to a business just as it does to an individual. Integrity is a core value in our Code of Ethical Conduct."

86.    Further to this end, the Code of Ethics states that "Celsius is a good corporate citizen not just because we comply with the law, but because our employees are also expected to act according to our ethical principles. We are committed to go beyond mere compliance – beyond simply "doing things right." We aspire to "do the right thing" by being faithful to and executing the principles and guidelines cited in this Code of Ethical Conduct and to act in ways that exceed the minimum standards set by law. Each of us is personally responsible for meeting this obligation."

87.    The Code of Ethics states that "Compliance with the law and honesty and integrity in our dealings with others are not to be sacrificed in the name of profits. We do not and will not condone any such action. We will attain our success through compliance with the law, dealings evidencing fairness and integrity, and a commitment to quality. We expect your wholehearted support of these Company values and principles."

88.    Under the heading, "PURPOSE OF THE CODE OF ETHICAL CONDUCT / POLICY STATEMENT," the Code of Ethics states the following:

This Code of Ethical Conduct sets forth the standards for business conduct at Celsius Holdings, Inc. and its affiliated companies ("Celsius"). It is intended to guide each employee in making business decisions to ensure that Celsius achieves its mission and its commitment to integrity.

Celsius strives to comply with all laws and regulations that are applicable to its business worldwide. Though customs vary country by country and standards may vary by business environment, Celsius emphasizes good faith efforts to follow the spirit and intent of the law. Good business results do not justify a violation of business ethics, the law, or regulations. Ethical business behavior should exist at a level well above what the law requires. Celsius' reputation for integrity is one of its most valued assets, and integrity is expected of everyone.

Neither this Code of Ethical Conduct nor any book of rules can provide all the answers. A Celsius employee must consider each situation carefully to ensure that he or she is acting ethically and in the best interest of the Company. Employees should consider whether their actions would withstand full examination by friends and associates or public disclosure in the press. If questions arise, employees should discuss the circumstances with our Compliance Director or their immediate supervisor.

Each employee is responsible for adhering to the Code of Ethical Conduct as a condition of continued employment; however, compliance with the Code of Ethical Conduct shall in no way alter your employment-at-will status. In addition, employees in Finance, Purchasing, or other specialized areas must comply with their own functional policies and requirements.

Violations of the Code may result in sanctions imposed by Celsius up to and including immediate termination of employment. Violations of the Code may also subject the individual employee to civil and criminal sanctions and shall be considered as an act outside of the scope of your employment.

89.    Under the heading "GENERAL POLICY REGARDING LAWS AND BUSINESS CONDUCT," the Code of Ethics provides in relevant part, that:

Celsius operates within the bounds of the laws, rules, and regulations that are relevant to our business. The rule of law is fundamental to civil society, to the democratic process, and to the conduct of business in a dynamic global marketplace. However, today's market demands that companies meet higher standards – simply obeying the law is not enough. To achieve higher standards of behavior, we need to make business decisions that are aligned with our ethical principles.

Supervisors must ensure that employees understand the values and are informed of the requirements relating to their jobs. They must also be available to answer employee questions or concerns and to guide them to other Celsius subject-matter experts when necessary. There are serious consequences for failing to follow these laws, up to and including termination of employment. Laws and regulations are sometimes ambiguous and difficult to interpret. In such situations, contact our Compliance Director for assistance.

90.     Under the heading "ETHICAL BUSINESS PRACTICES," the Code of Ethics provides in relevant part, that:

> Our success in the marketplace is based on the quality of our products and services, the value our products and services provide our customers, and the competence and honesty of our product and sales presentations. Celsius prospers only to the degree that we serve our customers well – and treat them, our suppliers, partners, teammates, and competitors fairly and honestly. When we fail to negotiate, perform, or market in good faith, we seriously damage our reputation and lose the loyalty of our customers.
>
> Fair competition is the hallmark of our relationships – our business dealings will be frank and respectful, and we strive to generate mutually advantageous, long-term relationships.

91.     Under the subheading "Accuracy of Books and Records," the Code of Ethics provides in relevant part, that:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. Many employees regularly use business expense accounts, which must be documented and recorded accurately. If an employee is not sure whether a certain expense is legitimate, the employee should ask his or her supervisor or the Company's CFO. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained.

92.     Under the subheading "Fraud and Similar Irregularities," the Code of Ethics provides in relevant part, that:

> Celsius prohibits fraud and has established procedures to be followed concerning the recognition, reporting, and investigation of suspected fraud. Fraud includes, but is not limited to
>
> • Dishonest or fraudulent acts:
>
> • Embezzlement;
>
> • Forgery or alteration of negotiable instruments such as Celsius checks and drafts;
>
> • Misappropriation of Celsius, employee, customer, partner, or supplier assets;
>
> • Personal use of cash, securities, supplies, or any other Celsius assets;
>
> • Unauthorized handling and reporting of Celsius transactions; and

• Falsification of Celsius records or financial statements for personal or other reasons.

93.     Under the subheading "Insider Trading," the Code of Ethics provides in relevant part, that:

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose, except the conduct of the Company's business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal. If a question arises, the employee should consult the Company's Chief Financial Officer.

94.     Within the subsection "Scope of Application" under the heading "IMPLEMENTATION," the Code of Ethics states the following:

The Code of Ethical Conduct applies to all employees of Celsius. The Code will be circulated annually to each officer, director, and manager, who will be responsible for ensuring that employees under his or her supervision understand and will comply with this Code.

95.     Within the subsection "Waiver of the Code of Ethical Conduct" under the heading "IMPLEMENTATION," the Code of Ethics states the following:

Any waiver of this Code for executive officers or directors may be made only by the Board or a Board committee and will be promptly disclosed to stockholders as required by law or stock exchange regulation.

96.     Under the heading "VIOLATIONS," the Code of Ethics states the following:

Any violation of the code of ethical conduct, or by not following the compliance procedures in item XII, will have serious consequences, up to and including termination of employment for cause. Violations of the Code may also subject the individual employee to civil and criminal sanctions and shall be considered as an act outside of the scope of your employment.

97.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Additionally, in violation of the

Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## CELSIUS'S AUDIT & ENTERPRISE RISK COMMITTEE CHARTER

98.     The Company's Audit & Enterprise Risk Committee Charter states the following about the Audit Committee's primary purpose:

> The purpose of the Committee is to report to and assist the Board by overseeing (1) the accounting and financial reporting processes of the Company, the audits of the Company's financial statements and of its internal control over financial reporting ("ICFR"), and the integrity of the Company's financial statements, (2) the qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor") consistent with the rules and regulations of the Securities and Exchange Commission (the "SEC") and the Public Company Accounting Oversight Board (the "PCAOB"), (3) the performance of the Company's internal audit function and Independent Auditor, (4) the effectiveness of the Company's internal control structure, (5) the compliance by the Company with significant legal and regulatory requirements, (6) risk exposures and the Company's policies with respect to risk assessment and risk management, and (7) such other matters as directed by the Board or this Charter.

> The Committee's function is one of oversight. The Company's management is responsible for preparing the Company's financial statements and, along with the internal auditors, for developing and maintaining systems of internal accounting and financial controls, while the Company's  Independent Auditor will assist the Committee and the Board in fulfilling their responsibilities for their review of these financial statements and internal controls. The Committee expects the Independent Auditor to call to the Committee's attention any accounting, auditing, internal accounting control, regulatory or other related matters that they believe warrant consideration or action. The Committee recognizes that the financial management and the internal and external auditors have more time, knowledge and more detailed information about the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or internal controls or any professional certification as to the Independent Auditor' work.

99.     Under the heading "DUTIES AND RESPONSIBILITIES," the Audit Committee Charter expands on the committee's responsibilities, stating in relevant part:

> Annually, obtain and review a report by the Independent Auditor describing (a) their internal quality-control procedures and (b) any material issues raised by the most recent internal qualitycontrol review, peer review or PCAOB review, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to any independent audit carried out by the firm and any steps taken to resolve

any issues raised in the above reviews, inquiries or investigations. This review shall include an evaluation of the lead partner of the Independent Auditor. The Committee shall present its findings from this report to the Board.

At least annually, review and approve the internal audit scope and internal audit plan, and at least annually review and make recommendations regarding the progress made with respect to executing the approved internal audit plan as well as any modifications made to the plan during the year. At least annually, review, discuss with the Company's Independent Auditor, and approve the functions of the Company's internal audit department, including its purpose, authority, organization, responsibilities.  Maintain a direct line of regular communication with the head of the Company's internal audit department.

Examine and review with the Independent Auditor, internal auditors and the Company's chief financial and accounting officers the findings, comments, and recommendations contained in the Independent Auditor's, and the internal auditors', summary audit reports, as presented to the Committee, and management's response to those reports, and advise the Board with respect thereto.

Review with management, the Independent Auditor and the internal auditors the effectiveness of the Company's ICFR and the quality and adequacy of any other internal controls that could significantly affect the Company's financial statements.

Review with the Independent Auditor the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company; and to review and discuss with the Company's Independent Auditor the Independent Auditor' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

The Committee shall periodically meet with management, the internal auditors and the Independent Auditor in separate executive sessions to discuss any matters which the Committee or these groups believe should be discussed privately with the Committee.

Discuss with management and the Independent Auditor the quality and adequacy of the Company's disclosure controls and procedures, and review disclosures made by the Company's principal executive officer and principal financial officer in the Company's periodic reports filed with the SEC regarding compliance with their certification obligations.

Review and discuss with management and the Independent Auditor the Company's quarterly earnings press releases, as well as financial information and earnings guidance to be provided to investors, analysts or rating agencies. Discuss with management the Company's policies with respect to the types of information and type of presentation to be used in earnings releases and in providing financial information and earnings guidance to the public, including review of any non-GAAP financial measures that the Company will be presenting and compliance of any such non-GAAP disclosure measures with the applicable rules and regulations of the SEC.

Review and discuss with management and the Independent Auditor the Company's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements and related footnotes (the "Audit Committee Financial Statement Review"), including: (i) disclosures therein concerning any material change to the accounting for non-cash compensation granted to Company employees and/or directors, including but not limited to Celsius stock options, Celsius stock shares, and/or restricted stock units ("Equity Compensation"), and, (ii) the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC. Prior to the filing of such Reports with the SEC, the Audit Committee shall also consider, as appropriate, any report from the Compensation Committee regarding any modification of or other issues that arise with respect to the Company's equity-related plans and arrangements. Following an Audit Committee Financial Statement Review, the Audit Committee shall report to the Board and provide a summary of the Audit Committee's discussion with management and the auditors during the Audit Committee Financial Statement Review, including discussion of any material change to the accounting for Equity Compensation. The Committee shall also have the opportunity to review and comment on the Company's response to any letters from the SEC Staff regarding any of the Company's filings with the SEC.

Review with management and the Independent Auditor the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, that may have a material impact on the Company's financial statements.

Review with, and make a recommendation to, the Board with respect to the inclusion of the audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", in the Company's Annual Report to Stockholders and in the Company's Form 10-K to be filed with the SEC.

Prepare the report from the Committee required by the rules of the SEC to be included in the Company's annual proxy statement.

Ensure that the management-led Disclosure Committee, as established during 2023 under its governing charter. is properly staffed and operating as an integral part of the Company's financial reporting process.

Discuss with management and the Independent Auditor matters related to (a) the Company's major financial risk exposures, including financial, operational, compliance, strategic, privacy, cybersecurity, business continuity, third party risks, legal and regulatory risks, any emerging risks, (b) the Company's policies with respect to risk assessment and risk management, and (c) the steps management has taken to monitor and control these exposures.

Approve Company procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for the confidential, anonymous submission by employees of concerns

regarding questionable accounting or auditing matters and regularly review any reports of such nature.

Periodically review the Company's material policies and procedures regarding ethics and compliance, including the Company's Code of Ethical Conduct and the Company's Code of Ethics for Senior Financial Officers (the "ethics codes"), and ensure the ethics codes have annually been distributed to applicable Company employees, directors and other individuals covered by the respective codes.

Review at least annually the effectiveness of the Company's compliance and ethics program, including the process for monitoring compliance with the Company's ethics codes. The Company's officers responsible for the Company's ethics codes shall have the authority to communicate personally to the Committee promptly on any matter involving criminal conduct or potential criminal conduct that poses a substantial risk to the Company.

Meet at least quarterly with the Chief Legal Officer to review known legal and regulatory matters that may have a material impact on the Company's financial statements, including legal cases against or regulatory investigations of the Company, and any material reports or inquiries received from regulators or government agencies. The Chief Legal Officer shall report to the Committee any material allegations of fraud or disclosure violations and prepare quarterly written reports (which may consist of a presentation deck) to the Committee and, as the Chief Legal Officer deems appropriate or the Committee requests, recommend remedial actions.

100.    In violation of the Audit Committee Charter, Defendants Miller (as chair), Levy, and Russell, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Miller (as chair), Levy, and Russell failed to maintain the accuracy of Company records and reports, failed to comply with laws and regulations, failed to act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and failed to properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

101.    Celsius is a Nevada incorporated company based in Boca Raton, Florida that operates in the functional energy drink category in the U.S. and internationally by engaging in the "development, processing, marketing, sale, and distribution of functional energy drinks to a broad range of consumers" and by providing "differentiated products that offer clinically proven and innovative formulas meant to positively impact the lives of our consumers."

102.    The Company's primary product is CELSIUS®, which is marketed as a fitness drink or supplement which, with exercise, is designed to accelerate metabolism and burn body fat while providing energy. The CELSIUS product line comes in two versions, a ready-to-drink form and an on-the-go powder form.

103.    In 2023, the Company introduced a new CELSIUS® Essentials line, available in 16-ounce cans. The Company's products are currently offered in major retail channels across the U.S., including via conventional grocery, natural, convenience, fitness, mass market, vitamin specialty and e-commerce, and internationally in certain Canadian, European, Middle Eastern and Asia-Pacific markets.

104.    Since expanding into the energy drink market, the Company has enjoyed significant growth in sales and revenue. For instance, the Company's 2023 sales exceeded $1.3 billion while in 2020 sales totaled $130.7 million. As such, Celsius' ability to keep growing at a remarkable clip is of paramount importance to the Company's stock price.

105.    The Company's long-term strategic partnership with Pepsi has been an integral part of the Company's rapid growth. On August 1, 2022, Celsius entered into the Distribution Agreement by which Pepsi would utilize its large network of retail and food service channels to be Celsius' primary product distributor in the U.S. and the exclusive product distributor in Canada.

106.    The Distribution Agreement also provided Pepsi the option to become Celsius' preferred distribution partner in other international markets. In executing the Distribution Agreement, Celsius terminated various supply agreements with existing suppliers to transition certain territory rights to Pepsi.

The Distribution Agreement also called for Pepsi to make a sizable investment in Celsius by purchasing 1.5 million shares of convertible preferred stock, called Series A Preferred Stock, for about $550 million, with the preferred shares entitled to a 5% annual dividend. Shares underlying the transaction were priced at $75 per share, or approximately 7.33 million shares, which provided Pepsi with an estimated 8.5% ownership in Celsius on an as-converted basis. The deal also permitted Pepsi to nominate a director to the Board. Pepsi chose Pepsi deputy CFO Defendant Lee.

107.    In the two years preceding the signing of the Pepsi deal in August 2022, the Company was already growing at a remarkable pace, with average sales growth exceeding 100%. For example, revenues rose from $130.7 million in 2020 to $314.3 million in 2021 to $653.6 million in 2022.

108.    Indeed, by dint of the Distribution Agreement, Celsius significantly cut its web of distributors and ended up "dependent on Pepsi's domestic distribution platforms."

109.    However, the Individual Defendants concealed that when Pepsi became Celsius' primary distributor, Pepsi made a large one-time purchase of Celsius product inventory during the first year of the partnership, which drove up the Company's 2023 revenues by more than 100% to $1.318 billion.

110.    This impressive growth made Celsius stock a shiny target, as the Individual Defendants made it outwardly appear as if demand for Celsius' products was booming while simultaneously concealing that Pepsi's warehouses were already overfilled with Celsius products from the massive one-time purchase.

111.    Making matters worse, Celsius had already recognized revenues for the products shipped to Pepsi, which would later have be drawn down and would adversely affect the Company's financial performance and outlook.

112.    During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

113.    Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Celsius, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## **False and Misleading Statements**

### *February 29, 2024 Press Release*

114.    On February 29, 2024, the Company issued a press release that reported the Company's financial results for the fourth quarter and full year of the 2023 Fiscal Year. The press release boasted about $347 million in revenue for the fourth quarter of the 2023 Fiscal Year, which was up 95% from $178 million for the prior year's fourth quarter, mostly powered by North American revenue, which rose 97% to $333 million, up from $169 million the prior year. The press release also represented that "***North American revenue was driven by expansion in total distribution points and higher SKUs per location***." The press release further reported sharp increases in gross profit, which was $166 million for fourth quarter of the 2023 Fiscal Year, up 110% from $79 million for the prior year fourth quarter. Gross profit as a percentage of revenue was 47.8% for the quarter, up from 44.4% for the prior year fourth quarter. The

Company attributed its 340 basis point improvement in gross profit margin to "efficiencies in raw material sourcing, product waste reduction, and benefits from improved leverage across promotional allowances." For the full year 2023 Fiscal Year, the press release attributed Celsius' record revenue to "**continued gains in distribution points and SKUs per location**." The press release quoted Defendant Fieldly:

> "During the fourth quarter of 2023, Celsius delivered record revenue of $347 million and more than $39 million in net income, driven by expanded availability of our products and increased consumer awareness. We continued to drive growth of the category by bringing in new loyal consumers, as well as increasing consumption occasions . . . ."

**February 29, 2024 Conference Call**

115.    On February 29, 2024, Celsius held an earnings conference call to discuss the Company's fourth quarter and full year of the 2023 Fiscal Year results. Defendant Fieldly began his discussion by stressing that "[i]n 2023, Celsius set a new yearly revenue record, growing more than 102% or $664 million in sales to finish the year at just over $1.3 billion," and further stating that "**Celsius is now truly a $1 billion brand**." Defendant Fieldly also stated that Celsius "**achieved nearly complete distribution coverage** in the United States, topping 98% ACV, which is a major achievement, putting [Celsius] products in reach of more consumers and more consumption occasions with greater flavors and size options than ever before."[2]

116.    Also, during his prepared remarks, Defendant Fieldly touted the Company's "impressive" market share gains in the 2023 Fiscal Year, stating that Celsius became the "first company to break the 10-share barrier in more than a decade." He also stated that per recent market data in the U.S. energy drink market for the 4-week period ended February 11, 2024, "Celsius held a new record of 11.5 share nationwide in MULOC."[3] Defendant Fieldly further mentioned that as of January 2024, Celsius exceeded

---

[2] ACV is an abbreviation for All Commodity Volume, and is a metric used to measure distribution coverage within a given market.

[3] MULOC is an abbreviation for Multi Outlet with Convenience Stores, and is a metric used to measure how a product is performing in different retail settings. Generally, the data consider grocery stores, drug stores, mass merchandisers, club stores, military commissaries, dollar stores, certain e-commerce sales,

a 15 share in over a dozen U.S. markets. Fieldly proclaimed: "The energy drink category is now a 3-team race." Defendant Fieldly also addressed Celsius' strategy to spur further growth:

> With nearly full distribution, we are focusing on driving growth through 3 areas: increasing total distribution points at each location, growing in nontracked channels and international expansion over the long-term horizon. Celsius was again the top driver of the energy category in dollars and units sold in MULOC, ending in the fourth quarter, up 126.6% and up 140.2% for the full year of 2023, supporting a 30.6% of all the energy category growth for the year.

117.    Also, during his prepared remarks during the February 29, 2024 earnings conference call, Defendant Fieldly stated that more space for products and product displays in stores was important to the Company's continued success:

> In 2024, spring resets began in January and typically run through May. *We are very pleased with the incremental space we're gaining, which will be reflected across the first and second quarters of 2024*. As a reminder, planograms used for most of 2023 when our dollar sales grew 140% were created while we were holding and held approximately 4.5 share in the category. For 2024, shelf space planning was conducted with retail partners in Q3 of 2023, when we held a digital – double-digit share position. *Celsius is also now fully integrated into PepsiCo's annual planning cycle, and we anticipate ongoing close collaboration with our primary North American distribution partner and expanded key accounts team*.
>
> *Our pursuit of a perfect store resulted in a 60% increase in display activity across the United States, and we placed more than over 10,000 Celsius branded coolers in 2023 and an increase of over 300% year-over-year*. We intend to continue growing our base of branded coolers throughout this year.

118.    During the same earnings conference call, Defendant Langhans, during his prepared remarks, discussed the tie between Celsius' success and its partnership with Pepsi:

> *As it relates to days on hand with our primary distributor, our inventory turns relative to depletions was consistent with our Q3 2023 turnover.*
>
> *We attribute our sales volume growth for the quarter compared to 2022 to several key drivers, including successful integration into the Pepsi distribution system, which has resulted in broader availability, increased SKU mix, and improved placement.*
>
> Gross profit for the 3 months ended December 31, 2023, increased 110% to $166 million, up from $79 million in the year ago quarter. Gross profit margins in the fourth quarter were

and convenience stores.

approximately 48% of revenues compared to approximately 44% for the prior year fourth quarter. ***The improvement in gross profit margins is attributed to*** efficiencies in raw material sourcing product-based reduction and ***benefits from improved leverage across promotional allowances. Q4 was the fifth consecutive quarter that we were operating within the Pepsi distribution system, and we expect to continue driving efficiencies while maintaining our #1 goal of keeping the shelf stock to meet strong consumer demand***.

119.    Regarding anticipated results for the 2024 Fiscal Year, Defendant Langhans stated the following: "As things stand today, we would expect 2024 gross profit margins to be fairly consistent with the Q4 and full year margin profile, ***as we are confident in maintaining the great progress that was made in 2023***."

***April 12, 2024 Proxy Statement***

120.    On April 12, 2024, Celsius filed the 2024 Proxy Statement with the SEC. Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

121.    The 2024 Proxy Statement called for shareholder approval of, *inter alia*: (1) the election of eight directors, Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell; and (2) the ratification of the appointment of Ernst & Young LLP as the Company's independent public accountants for the 2024 Fiscal Year.

122.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided, in relevant part:

> We have adopted a Code of Ethical Conduct ("Code of Ethics") that applies to all of our executive officers, directors and employees and which codifies the business and ethical principles that govern all aspects of our business. The Board also adopted a Code of Ethics for Senior Financial Officers (the "Senior Financial Officer Code of Ethics", and collectively with the Code of Ethics, the "Codes"), which is applicable to all senior executive officers (including the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions). A copy of each of the Codes is available on the Company's website at https://www.celsiusholdingsinc.com/code-of-ethics/. If we make any substantive amendments to the Codes or grant any waiver from a provision of the Codes to any executive officer or director, we intend to promptly disclose the nature of the amendment

or waiver on our website to the extent required by applicable SEC rules and Nasdaq requirements. The information on the Company's website does not constitute part of this proxy statement and is not incorporated by reference herein.

123.    Regarding the "Board of Directors' Role in Risk Oversight," the 2024 Proxy Statement provided the following:

> The Board of Directors has an oversight role as a whole and at the committee level in overseeing management of the Company's risks. The Board regularly reviews with management the financial and operational risks that management believes could substantially impact the Company. The Board has designated the Enterprise Risk and Audit Committee as being responsible for direct oversight of the Company's risk processes. Members of the Enterprise Risk and Audit Committee have periodic meetings with management and the Company's independent auditors to perform risk oversight with respect to the Company's internal control processes. Members of the Enterprise Risk and Audit Committee also meet with management on a regular basis to review and discuss the Company's major risk exposures, including financial, operational, compliance, strategic, privacy, cybersecurity, business continuity, third party risks, legal and regulatory risks, and any emerging risks. The Compensation Committee is responsible for overseeing the risks relating to employee compensation plans and arrangements, including those for our executive officers, and the Nominating and Governance Committee is responsible for ensuring that the Company is appropriately addressing those risks that may arise from changing governance requirements. The Enterprise Risk and Audit Committee has oversight responsibility for cybersecurity matters, and the Nominating and Governance Committee oversees the Company's ESG planning and initiatives.

124.    Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

125.    The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

126.    As a result of Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Ernst & Young LLP as the Company's independent public accountants for the 2024 Fiscal Year.

***May 7, 20224 Press Release***

127.    On May 7, 2024, the Company issued a press release that reported the Company's financial results for the first quarter of the 2024 Fiscal Year. The press release boasted about Celsius' "[r]ecord first quarter revenue of $355.7 million, up 37% year over year," "[r]ecord first quarter gross profit of $182.2 million, up 60% year over year," and its "[f]irst quarter diluted EPS of $0.27, up 108% year over year." The press release also quoted Defendants Fieldly and Langhans, who spoke about the Company's growth, as well as making strides in shelf space gains. Defendant Fieldly stated the following in the press release:

> "Celsius reported its best first quarter ever driving record revenue and contributing 47% of the quarterly year-over-year growth in the energy drink category. ***Our category share of 11.5 percent as of April 14 reflects the early impact of shelf space gains that we are earning from company-record and ongoing retailer resets, which we believe will serve as a flywheel for our continued growth.*** Celsius product innovation this year has delighted consumers with the most refreshing products we've ever created."

128.    Defendant Langhans stated the following in the press release:

> "Celsius' first quarter revenue of $356 million and year-over-year growth of 37 percent is a record, despite changes in days on hand inventory by our largest customer. Our solid 51 percent first quarter gross margin reflects a balanced and disciplined approach to leveraging ***while simultaneously building the business and expanding globally***, as well as an accelerated benefit from raw materials pricing and reduced freight costs."

129.    The press release addressed Celsius' share growth, stating that Celsius now "held an 11.5% share in the energy drink category in total U.S. MULOC for the last four weeks ended April 14, 2024 – a one-point increase over the prior quarter and approximately four points higher than one year ago." The press release further stated that Celsius' market share performance "delivered quarter-over-quarter sales growth for Celsius of 9.6% during a period when the energy category declined 0.4%" and added that "[s]ugar-free segment sales in the first quarter were approximately 50% of the energy drink category."

130.    The press release further provided the following about "shelf resets" in retail stores, where the Company was trying to grow its presence:

> We estimate that retailers' spring shelf resets were approximately one-third complete as of March 31, and once concluded, we are expecting our best shelf space gains in company history. The importance of these space increases and placement improvements cannot be overstated. The visual impact of multiple, full shelves of cold Celsius in convenience store coolers and on grocery shelves is a powerful in-store billboard and showcases more of the Celsius product portfolio. The full effect of shelf space gains is expected to be reflected in scanner data beginning in July 2024.

131.    Yet, the press release stated that revenues were "offset" by "inventory movements" within Celsius' "largest distributor where first quarter 2024 inventory days on hand declined versus the fourth quarter resulting in an approximate $20 million impact, while first quarter 2023 revenue benefited from an inventory buildup of approximately $25 million." The press release went on to state that "***inventory fluctuations* may be expected**" in subsequent quarters because Pepsi was responsible for 62% of the Company's total North American sales during the first quarter of the 2024 Fiscal Year. However, the press release assured investors that "***retail sales of Celsius in total U.S. MULOC grew by 72.1% in the first quarter of 2024 year over year, and subsequent-period sales show ongoing consumer demand***."

### *May 7, 20224 Earnings Conference Call*

132.    On May 7, 2024, Celsius held an earnings conference call to discuss the Company's first quarter of the 2024 Fiscal Year results. Defendant Fieldly began his discussion by stressing the Company's recent growth:

This morning, Celsius reported a 37% year-over-year increase in revenue for the first quarter of 2024, totaling $355.7 million for the period, a new first quarter revenue record for the company.

***Celsius alone was responsible for approximately 47% of the entire energy drink category growth year-over-year in the first quarter***. And as we reported in this morning's press release, Celsius now holds an 11.5% share in MULOC for the 4 weeks period ending April 14, according to Circana. ***This is a full point higher than the Q4 2023 and 4 points higher than 1 year ago.***

***These results, on their own, are very strong, especially after growing at a triple digit for the past 3 consecutive years.***

133. Proceeding with his remarks, Defendant Fieldly discussed Celsius' "inventory movements" and stated that the Company's first quarter of the 2024 Fiscal Year revenue "would have been higher, except that it was adversely affected due to inventory movements by our largest customer, which is beyond our control." Defendant Fieldly further stated that the "year-over-year inventory variation is attributable to elevated first quarter 2023 restocking, which we believe was meant to compensate for the fourth quarter 2022 destocking and to prepare for a robust spring reset that were planned in 2023," but that "no such first quarter restocking and spring reload in was observed this year," and that "***[a]bsent these effects, we would have seen a higher growth rate***."

134. Additionally, Defendant Fieldly stated that "[o]ngoing inventory fluctuations may be expected in subsequent quarters because our largest distributor constitutes approximately 62% of our total North America business during the first quarter of 2024," however, at the same time he also emphasized that "[w]hile these inventory ***fluctuations caused noise*** in our sequential quarterly revenue figures, ***what's important to focus on here is that Celsius is constantly on shelves, stocked cold, stacked high with a 98.4% ACV***" and "***our category across all tracked channels and on track channels continues to grow***."

135. Regarding growth in demand, Defendant Fieldly referenced "space gain[s]" on shelves, stating the following, in relevant part:

We estimate that retailers' spring resets were approximately 1/3 complete at the end of the quarter. And once concluded, ***we're expecting our best shelf space gains in the company history.***

*The importance of these space gain increases and placements and improvements cannot be overstated.* The visual impact of multiple full shelves of cold Celsius in convenience stores and coolers and in the grocery shelf is a powerful in-store billboard and showcases our portfolio. *The full effect of these shelf resets is expected to be reflected in the scanner data beginning in July.*

136.    While discussing Celsius' "*new incentive program with Pepsi*," Defendant Fieldly stated that it "*further aligns our shared interest* within the energy category, including alignment around priorities and delivering a program that will contribute to our long-term goal of becoming the #1 energy drink brand in the world." Defendant Fieldly further stated that as Celsius geared up for its summer advertising campaign, the Company was "well positioned with the best in-store presence in company history" and "a strong aligned partnership with our North America distribution partner."

137.    After Defendant Fieldly concluded his prepared remarks, Defendant Langhans launched into his prepared remarks, stating that Celsius was "continu[ing] to stick with our commentary from February, where we noted that *gross margins in the high 40s was very achievable.*"

138.    During the question-and-answer part of the call, certain of the Individual Defendants were asked about inventory levels and the prospect that the Company appeared to be  shipping less product than demand required. Defendant Fieldly replied by stating that the Company's "partners" (Pepsi) were "at really good inventory levels right now" and that Celsius was "maintaining deliveries" and "keeping products in stock" and "just broke a record on the share gain to 11.5." He further stated that  "product is flowing," and despite "some optimization" of inventory "on both sides," the Company felt "really good where we're at" and further represented that "we're in a really good place" and "[w]e have good inventory levels now." Defendant Fieldly finished his response by stating the following: "We feel confident in our inventory levels and confident in Pepsi inventory levels supporting our growth."

139.    Later in the call, Defendant Fieldly was asked if the market should "expect any more destocking," and whether that was "something we should watch out for," Defendant Fieldly replied by stating that sales were "flowing" and being "strong," and further stated that "it seems to be like the

balancing has been finalized" but that the Company could not control what Pepsi would do with inventory levels.

140.    The statements referenced in ¶¶ 114-119 and 127-139 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## The Truth Begins to Emerge While False and Misleading Statements Continue

### *May 27, 2024 Nielsen Report*

141.    The truth began to emerge on May 27, 2024, when Nielsen reported the latest trends in retail store performance. Market analysts quickly responded by writing that the Company faced difficult sales comparisons for the next few quarters and that product sales could be significantly less as Pepsi cut the amount of product inventory it held, resulting in "2Q24 sales below end-demand."

142.    On this news, the Company's stock price fell $12.23 per share, or almost 13%, from closing at $95.15 per share on May 24, 2024, to close at $82.92 per share on May 28, 2024, the next trading day.

### *August 6, 2024 Press Release*

143.    However, the Individual Defendants continued to make false and misleading statements. On August 6, 2024, the Company reported its second quarter of 2024 financial results, which stated that revenue rose 23% year-over-year to $402 million, international sales enjoyed a 30% jump to $19.6 million, and sales to Amazon rose 41% to about $39.9 million. Defendant Fieldly was quoted in the press release as stating that the Company had "'its best second quarter financial results ever, delivering records in revenue, gross profit and gross margin.'"

***August 6, 2024 Earnings Conference Call***

144.    During the accompanying earnings conference call held that same day to discuss the Company's second quarter of 2024 financial results, Defendant Fieldly stated that the Company "still grew at 10x the category growth rate in the second quarter," that Celsius was "moving aggressively to gain our growth and momentum," and that the Company has "great programs for the back half of the third quarter and into the fourth quarter."

145.    Specifically, in Defendant Fieldly's opening prepared remarks, he stated the following about the Company's relationship with Pepsi:

> Our partnership with Pepsi remains strong. The added incentive program announced last quarter continues to percolate through the system and is expected to be fully ramped in the second half of this year where we have fully incentivized our partner to lean in with us.

146.    Also, during the call, Defendant Langhans addressed Celsius' sales volume growth, including "inventory movements." He stated the following in relevant part:

> We attribute our sales volume growth for the quarter to several key factors, including our ability to drive increased consumer demand, strong innovation and excellent in-store execution by our key account and field sales teams, offset in part by inventory timing movements or days on hand associated with our largest distributor.
>
> During the quarter, we publicly stated that the impact of the inventory movements during the middle of June was approximately $20 million to $30 million. As we closed the quarter, we saw a slight uptick in the days on hand, and as a result, the impact was at the lower end of that range. Keep in mind, the energy drink category second quarter year-over-year unit sales volume was flat.

147.    In the Q&A segment of the earnings conference call, certain of the Individual Defendants received a question about the effects of Pepsi "tweaking" its product inventories so that investors could "get a sense of what it actually ended up being in the quarter." Defendant Langhans replied in the following way:

> So I mentioned in the prepared remarks and back in June that there was kind of a potential $20 million to $30 million headwind because of the DOH changes. So that ended up on the back half of – so the lower end of that range, so more in the 20 to 25 range as opposed to the higher end of the range. So that's where we ended the quarter when it relates to that piece.

148.    The statements referenced in ¶¶ 143-147 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth Fully Emerges**

***September 4, 2024 Barclays 17th Annual Global Consumer Staples Conference***

149.    On September 4, 2024, during market hours, Defendant Fieldly and Celsius Chief of Staff David attended the Barclays 17th Annual Global Consumer Staples Conference. During the conference, Defendant Fieldly addressed the Company's Distribution Agreement with Pepsi. In so doing, he revealed

that the Company's sales to Pepsi were cut from "roughly around [$]100 million to [$]120 million . . . from what [Pepsi] ordered last quarter."

150.    Defendant Fieldly further stated that the Company was "still seeing these inventory levels being reduced" and that it had "increased" in the third quarter of 2024. David provided more color to Defendant Fieldly's comments, stating: "[J]ust to be precise with the [$]100 million to [$]120 million figure, . . . we're seeing approximately [$]100 million to [$]120 million less in orders to Pepsi in Q3 this year versus Q3 last year."

151.    David further stated that since the Company recognizes revenue when its products are delivered to Pepsi and not when the products are actually sold in stores, store-level sales were not capable of identifying the lost revenue. He further revealed: "What we are seeing correlate is depletions out of the Pepsi warehouse" which "simply means that they were holding to several million more cases over the past 1.5 years than they really needed to hold, and they're optimizing their network now." Simply put, the Company's sales to Pepsi were much higher than market demand for the Company's products, and Pepsi was working to deplete the extra product inventory from its warehouses. Therefore, if Pepsi had not bought surplus product from the Company, the Company's reported financial results in previous periods would have been materially lower.

152.    On this news, the Company's stock price fell $4.11 per share, or about 11.6%, from closing at $36.50 per share on September 3, 2024, to close at $32.39 per share on September 4, 2024.

***November 6, 2024 Press Release***

153.    The truth fully emerged on November 6, 2024, when, before the market opened, the Company reported, via press release, its third quarter of 2024 financial results, revealing the true impact Pepsi's product inventory hoarding had on Celsius' overall business. Defendant Fieldly revealed in the press release that the "'[p]ronounced supply chain optimization by'" Pepsi that he personally had touted "'had an outsized and adverse impact on [Celsius'] operating results.'" Similarly, Defendant Langhans

revealed that the Company's "'[g]ross and operating margins in the third quarter fell short due to significantly reduced orders because [its] largest distributor implemented a sizable . . . supply chain optimization program in the quarter.'"

154.    Consequently, the Company's third quarter of the 2024 Fiscal Year "revenue was approximately $265.7 million, compared to $384.8 million for the" third quarter of the 2023 Fiscal Year; the Company's North American revenues fell 33% and its "'[r]evenue from [Pepsi] declined $123.9 million,'" while "[c]oncurrently, related retailer promotional allowances created revenue headwinds." The Company further revealed that its third quarter of the 2024 Fiscal Year "gross profit decreased by $71.9 million, or 37%, to $122.2 million from $194.1 million" in the 3Q23, that its third quarter of the 2024 Fiscal Year "[g]ross profit margin was 46.0% . . . , a 440 basis point decrease from 50.4% for the same period in 2023," and that the "decrease in gross profit was due to promotional allowances, incentives, and other billbacks as a percentage of gross revenue" from Pepsi's product inventory drawdown.

155.    On this news, the Company's stock price fell $1.69 per share, or about 5%, from closing at $31.73 per share on November 5, 2024, to close at $30.04 per share on November 6, 2024.

## DAMAGES TO CELSIUS

156.    As a direct and proximate result of the Individual Defendants' conduct, Celsius has lost and expended, and will continue to lose and expend, many millions of dollars.

157.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the

Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

160.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

161.    As a direct and proximate result of the Individual Defendants' conduct, Celsius has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control.

## **DERIVATIVE ALLEGATIONS**

162.    Plaintiff brings this action derivatively and for the benefit of Celsius to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Celsius, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and for violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

163.    Celsius is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164.    Plaintiff is, and has been at all relevant times, a shareholder of Celsius. Plaintiff will adequately and fairly represent the interests of Celsius in enforcing and prosecuting its rights, and, to that

end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

165.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

166.    A pre-suit demand on the Board of Celsius is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Fieldly, Kravitz, Miller, Levy, DeSantis, Russell, and Castaldo (the "Director-Defendants"), along with non-parties Hans Melotte and Israel Kontorovsky (together with the Director-Defendants, the "Directors.") Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

167.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

168.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, six of the Directors sold Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

169.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols, especially regarding revenue projections,

accounting procedures, and financial reporting, are an integral part of the Company's business. Maintaining adequate risk management and compliance procedures lie at the core operations of Celsius and are the primary responsibility of the Board. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

170.    As Board members of Celsius charged with overseeing the Company's affairs, all the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Celsius, the Director-Defendants must have been aware of the material facts regarding the issues plaguing Celsius' risk management systems and accounting procedures.

171.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Celsius to issue materially false and misleading statements. Specifically, the Director-Defendants caused Celsius to issue false and misleading statements which were intended to make Celsius appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

172.    To date, Director-Defendants Fieldly, Castaldo, DeSantis, Kravitz, Levy, and Miller have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein. As a result of the false and misleading statements, Director-Defendants Fieldly, Castaldo, DeSantis, Kravitz, Levy, and Miller Defendant Missling have collectively profited by over $491 million during the Relevant Period.

173.    Additional reasons that demand on Defendant Fieldly is futile follow. Defendant Fieldly has served as Chairman of the Board since August 2021, as CEO since April 2018 and as a member of the

Board since March 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Fieldly with his principal occupation, and he receives handsome compensation, including $3,260,513 for the 2023 Fiscal Year alone. Defendant Fieldly was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings, conference calls, and press releases referenced herein, which he either personally made or signed off on or so stated. As a trusted, long-time Company director and the Company's highest officer, he is directly responsive for the false and misleading statements alleged herein, and he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Fieldly solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Fieldly has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $10.2 million. Moreover, Defendant Fieldly is a defendant in the Securities Class Action. For these reasons, too, Defendant Fieldly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Castaldo is futile follow. Defendant Castaldo has served as a Company director since March 2013. He also serves as a member of the Human Resources & Compensation Committee and as a member of the Governance & Nominating Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Castaldo solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Fieldly, DeSantis, Kravitz, Lee, Levy, Miller, and Russell, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Castaldo has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $13.7 million. For these reasons, Defendant Castaldo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant DeSantis is futile follow. Defendant DeSantis has served as a Company director since March 2013. He also serves as the Chair of the Governance & Nominating Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant DeSantis solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Fieldly, Castaldo, Kravitz, Lee, Levy, Miller, and Russell, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant DeSantis has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $463.4 million. For these reasons, Defendant DeSantis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Kravitz is futile follow. Defendant Kravtiz has served as the Lead Independent Director and as a Company director since April 2016. He also serves as a member of the Human Resources & Compensation Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Kravitz solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Fieldly, Castaldo, DeSantis, Lee, Levy, Miller, and Russell, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Kravitz has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $1.5 million. For these reasons, Defendant Kravitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Levy is futile follow. Defendant Levy has served as a Company director since July 2020. She also serves as a member of the Audit and Enterprise Risk Committee and as a member of the Governance and Nominating Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Levy solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of herself and Defendants Fieldly, Castaldo, DeSantis, Lee, Kravitz, Miller, and Russell, allowing them to continue to breach their fiduciary duties to

the Company. Additionally, Defendant Levy has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $1.9 million. For these reasons, Defendant Levy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since August 2021. She also serves as the Chair of the Audit and Enterprise Risk Committee and as a member of the Governance and Nominating Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Miller solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of herself and Defendants Fieldly, Castaldo, DeSantis, Lee, Kravitz, Levy, and Russell, allowing them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Miller has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $250,980. For these reasons, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Russell is futile follow. Defendant Russell has served as a Company director since October 2021. She also serves as a member of the Audit and Enterprise Risk Committee and as the Chair of the Human Resource and Compensation Committee. As a

trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Russell solicited the 2024 Proxy Statement which contained material misrepresentations and omissions that led to the re-election of herself and Defendants Fieldly, Castaldo, DeSantis, Lee, Kravitz, Levy, and Miller, allowing them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Russell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on the Board is futile follow.

181.    Defendants Miller (as Chair), Levy, and Russell (the "Audit Committee Defendants") served as members of the Audit & Enterprise Risk Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

182.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and

prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

183.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

184.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

185.    The acts complained of herein constitute violations of fiduciary duties owed by Celsius' officers and directors, and these acts are incapable of ratification.

186.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Celsius. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Celsius, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

187.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Celsius to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

188.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or

of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192.    Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

193.    Under the direction and watch of the Individual Defendants, the 2024 Proxy also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its

committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

194.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including the election of directors and the ratification of the appointment of an independent registered public accounting firm.

195.    As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted to re-elect Defendants Fieldly, Castaldo, DeSantis, Kravitz, Lee, Levy, Miller, and Russell to the Board, thus allowing them to continue breaching their fiduciary duties to Celsius.

196.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

197.    Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Celsius' business and affairs.

200.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

201.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Celsius.

202.    In breach of their fiduciary duties owed to Celsius, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company sold products to Pepsi at levels which grossly outpaced demand for the Company's products; (2) as a result, Pepsi would not need to purchase more product from the Company in future periods as Pepsi needed to extinguish its surplus product inventory first; (3) consequently, the Company's sales rate and impressive growth was not sustainable and would materially decline as Pepsi's purchases of product inventory declined; (4) the Company failed to maintain adequate internal controls; and (5) as a further result of the foregoing, the Company materially overstated its financial position, growth potential, and overall business outlook. As a result of the foregoing, the Company's public statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

203.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

204.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

205.    In yet further breach of their fiduciary duties, during the Relevant Period, seven of the Individual Defendants engaged in lucrative insider sales, netting collective proceeds of over $491 million.

206.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celsius' securities.

207.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celsius' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

208.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

209.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Celsius has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210.    Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

211. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Celsius.

213. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Celsius that was tied to the performance or artificially inflated valuation of Celsius, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

214. Plaintiff, as a shareholder and a representative of Celsius, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

215. Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## **FOURTH CLAIM**

### **Against Individual Defendants for Waste of Corporate Assets**

216. Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

217. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

218. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Celsius to waste valuable

corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

220.    Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

221.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Celsius in a manner consistent with the operations of a publicly held corporation.

223.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Celsius has sustained and will continue to sustain significant damages.

224.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

225.    Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

226.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

Verified Amended Shareholder Derivative Complaint

227. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Celsius, for which they are legally responsible.

228. As a direct and proximate result of the Individual Defendants' abuse of control, Celsius has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229. Plaintiff, on behalf of Celsius, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendant Fieldly and Langhans for Contribution Under Sections 10(b) and 21D of the Exchange Act

230. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231. Celsius and Defendants Fieldly and Langhans are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Fieldly and Langhans' willful and/or reckless violations of his obligation as officers and directors of Celsius.

232. Defendants Fieldly and Langhans, because of their positions of control and authority as officers and/or directors of Celsius, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Celsius, including the wrongful acts complained of herein and in the Securities Class Action.

233. Accordingly, Defendants Fieldly and Langhans are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

234.    As such, Celsius is entitled to receive all appropriate contribution or indemnification from Defendants Fieldly and Langhans.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Celsius, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached aided and abetted the breach of their fiduciary duties to Celsius;

(c)    Determining and awarding to Celsius the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Celsius and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Celsius and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Celsius to nominate at least tour candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with

applicable laws, rules, and regulations.

(e)    Awarding Celsius restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2024                          Respectfully submitted,

Of Counsel:                                       **LEVERTY & ASSOCIATES LAW CHTD.**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501                      Patrick R. Leverty
New York, NY 10017                                832 Willow Street
Telephone: 516. 922.5427                          Reno, NV 89502
Facsimile: 516.344.6204                           Tel. 775.322.6636
Email: tbrown@thebrownlawfirm.net                 Fax. 775.322.3953
                                                  Email: pat@levertylaw.com

                                                  *Attorneys for Plaintiff*

Verified Amended Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Kurt Dobler, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of December, 2024.

Signed by:

*Kurt Dobler*

E0C85A51B726464

Kurt Dobler